ROCHEZ BROTHERS, INC., a Pennsylvania Corporation, Appellant,

v.

Charles R. RHOADES et al.

No. 74–2208.

United States Court of Appeals, Third Circuit.

Argued May 16, 1975.

Decided Sept. 29, 1975.

Ralph H. German, William S. Smith, Houston, Cooper, Speer & German, Pittsburgh, Pa., for appellant.

Edmund S. Ruffin, III, Thorp, Reed & Armstrong, Pittsburgh, Pa., for M.S. & R., Inc., etc.

Robert G. MacAlister, Charles B. Watkins, W. Gregg Kerr, Jr., Eckert, Seamans, Cherin & Mellott, John A. Metz, Jr., Metz, Cook, Hanna & Kelly, Pittsburgh, Pa., for Charles R. Rhoades.

Before STALEY, ROSENN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

STALEY, Circuit Judge.

We are asked to determine whether a corporation is derivatively liable when its president has violated the fraud provisions of the Securities Exchange Act of 1934. Appellant, Rochez Brothers, Inc. ("Rochez"), appeals from the district court's finding that no evidence was presented to establish the liability of the corporate defendant, M.S. & R., Inc. ("MS&R"). Rochez argues that MS&R is liable under three theories: As a principal under agency concepts; as an aider-abettor and conspirator; and as a controlling person under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). We affirm the judgment of the district court, finding no support for appellant under any of its theories.

This case arose from a buy-sell agreement whereby Joseph Rochez sold fifty per cent of the MS&R issued and outstanding stock to Charles R. Rhoades. The essential facts have been well set forth in the district court's opinion[1] and in Judge Van Dusen's opinion in *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402 (3d Cir. 1974) and will not be repeated. It is sufficient here to briefly summarize the facts. Rhoades, President of MS&R, was found guilty of violating Rule 10b–5 of the Securities and Exchange Commission by his failure to disclose to Rochez, the Executive Vice President of MS&R, information that affected the value of the stock purchased by Rhoades from Rochez. Rhoades did not tell Rochez about two prospective purchasers of MS&R which were brought to Rhoades' attention by a financial adviser, Royce, employed by Rhoades to help him arrange financing for the purchase from Rochez. In September 1967, Rhoades entered into an agreement with Rochez for the purchase of Rochez's fifty per cent interest in MS&R; in July 1968, Esterline bought one hundred per cent of the MS&R stock then held by Rhoades and two other persons.

Suit was brought by Rochez and the case was tried to the court. Judgment was entered against Rhoades and in a separate order dismissed as to MS&R. The district court predicated its finding of guilt on the fact that Rhoades failed to disclose material information concerning possible buyers of MS&R prior to the sales agreement of September 1967. The court further held that Rhoades acted on his own at all times and "not in the course or scope of his employment," and because of this, MS&R could not be secondarily liable.[2] Rochez and Rhoades appealed seeking reversal of the district court's order. Rochez contended that MS&R was secondarily liable whereas

1. *Rochez Bros., Inc. v. Rhoades,* 353 F.Supp. 795 (W.D.Pa.1973).

2. The order of the district court dismissing MS&R stated:

"The Court being of the opinion that any wrongdoing of defendant Rhoades was on his own account as a stockholder and individual and not in the course or scope of his employment by the said corporate defendant, MS&R, Inc., or for the account or benefit of said corporate defendant or attributable in anywise to said corporate defendant, said corporate defendant being instead the passive object of such transfers of its stock as were effected through the activities (wrongful or otherwise) of said defendant Rhoades . . . .."

Rhoades contended that he was not liable at all.

This court affirmed the liability of Rhoades. On the issue of corporate liability, Judge Van Dusen vacated the district court's order and remanded the case because the district judge failed to comply with Rules 41(b) and 52(a) of the Federal Rules of Civil Procedure by not making findings of fact to support the dismissal of MS&R. *Rochez, supra* at 413.

The district court on remand made findings of fact and remained of the view that "no sufficient evidence appears in the record" that would establish the liability of MS&R.[3] The district court maintained that the only time MS&R's facilities or employees were used by Rhoades was in the preparation of financial forecasts. These forecasts were not relied on by Rochez in the course of business nor by the district court in finding Rhoades' 10–b violation. *Rochez*, 353 F.Supp. at 802. The district court also found, in concluding MS&R was not liable, that these activities by the MS&R employees were "ministerial functions" and the employees had no reason to know that they were involved in anything unlawful or fraudulent. Considering de novo appellant's new theory of liability under Section 20(a), the district court found that MS&R was not a "controlling person" and at all times' acted in good faith. The court concluded, therefore, that MS&R was not liable under Section 20(a).

## AGENCY

■ Appellant first urges us to find MS&R liable under the principles of agency. There is no doubt that the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the

course of his employment, and (2) for the benefit of the corporation. This is true even if the officer's conduct was unauthorized, effected for his own benefit but clothed with apparent authority of the corporation, or contrary to instructions.[4] The underlying reason is that a corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while transacting corporate business.[5] A corporation, however, is not liable for the fraud of its officer when the officer acted as an individual for his own account and the defrauded party knew that the officer was not acting for the corporation. Upon reviewing the record and the district court's findings of fact, we find no basis for imputing liability to MS&R. The circuit courts are split on what standards are applied to find secondary liability. This court has yet to express what standards govern secondary liability when a director is found guilty of a securities act violation. We are of the opinion that, after reviewing the legislative history of the 1934 Act and the pertinent cases, the principles of agency, i. e., *respondeat superior*, are inappropriate to impose secondary liability in a securities violation case.

■ It is helpful to evaluate the legislative history of the 1934 Act and specifically Section 20(a) thereof, which governs liability of controlling persons.[6] By enacting Section 20(a), Congress wanted to impose liability on persons who were able to directly or indirectly exert influence on the policy and decision-making process of others. Although Section 20(a) does not define "control," it is clear that the evidence in each case must be examined to determine to what extent the controlling person was involved in the fraudulent scheme. The legislative

---

3. Opinion of the district court, *Rochez v. Rhoades*, 390 F.Supp. 470 (W.D.Pa.1974).

4. 10 Fletcher, Cyclopedia Corporations § 4886 at 298 (rev. ed. 1970).

5. *Id.* at 299.

6. Section 20(a) provides in pertinent part:

"Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, . . . ."

history of Section 20(a) illustrates that Congress intended liability to be based on something besides control. That something is culpable participation.

The Senate and the House each advanced its version of what standard should govern controlling persons. The Senate proposed an "insurer's liability" standard, while the House opted for a "fiduciary standard" which would impose a duty of due care. S.Rep. 47, 73d Cong., 1st Sess. 5 (1933) (The Fletcher Report); H.R.Rep. 85, 73d Cong., 1st Sess. 5 (1933); H.R.Rep. 152, 73d Cong., 1st Sess. 27 (1933). The House version was adopted, indicating that Congress did not intend anyone to be an insurer against the fraudulent activities of another. What Congress did intend was to impose liability on those who were controlling persons and who were "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973).

Judge Adams in *Kohn v. American Metal Climax*[7] reviewed the legislative history of Rule 10b–5 and concluded that Congress, through the use of words such as " 'cunning,' 'manipulative,' 'deceptive,' 'fraudulent,' 'illicit,' 'fraud,' and lack of 'good faith' " intended that liability would not attach unless the element of culpability was present. *Kohn, supra* at 280. Since the standard of culpability is ever-present in the securities laws, it is reasonable that the same standard should be included in Section 20(a). Section 20(a) also provides a good faith defense. If we were to apply *respondeat superior*, the availability of this good faith defense would be bypassed. Therefore, to use *respondeat superior* for imposing secondary liability would not advance the legislative purpose of the 1934 Act and in fact would also undermine the Congressional intent by emasculating Section 20(a).

We also find support for this position in several cases that dealt with the question of applicable standards for secondary liability. In *Myzel v. Fields*, 386 F.2d 718 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), the Eighth Circuit indicated that liability for securities act violations was governed by Section 20(a) and not by any agency theories. In *Kamen & Co. v. Paul H. Aschkar & Co.*,[8] the trial court awarded judgment to the plaintiff on agency principles. On cross appeal, the plaintiff contended that since the employee was liable, the employer should also be liable. The Ninth Circuit rejected this argument, holding that Section 20(a), and not principles of agency, was applicable to determine secondary liability. *Kamen, supra* at 696, 97.[9]

■ If we were to apply *respondeat superior* as appellant wishes, we would in essence impose a duty on a corporation to supervise and oversee the activities of its directors and employees when they are dealing with their own corporate stock as individuals, and not for the corporation or for the benefit of the corporation. To impose such a duty would make the corporation primarily liable for any security law violation by any officer or employee of the corporation. We believe that Congress did not intend to expand liability to this degree when it passed the Securities Exchange Act. We recognize that corporations do have certain duties imposed on them for protection of public interest. To exact this duty on a mere showing of a principal-agent relationship would violate the legislative purpose and effectively nullify the "controlling person" provision of the

---

7. 458 F.2d 255 (3d Cir. 1972) (Adams dissenting and concurring) *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972).

8. 382 F.2d 689 (9th Cir. 1967), *cert. granted*, 390 U.S. 942, 88 S.Ct. 1021, 19 L.Ed.2d 1129, *cert. dismissed*, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968).

9. The Ninth Circuit recently reaffirmed the "Kamen Rule," holding that secondary liability is measured by applying the "controlling person" and good faith standards of Section 20(a) and not the doctrine of *respondeat superior*. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir. 1975).

Act.[10] See also *Lanza v. Drexel & Co.*, 479 F.2d at 1299.

We are not faced with the type of relationship that prevails in the broker-dealer cases where a stringent duty to supervise employees does exist.[11] This duty is imposed to protect the investing public and make brokers aware of the special responsibility they owe to their customers. We can find no reason to impose this same duty in a situation like the one presently before us where the parties were dealing for themselves and for their own accounts.

■ We conclude therefore, that agency principles—*respondeat superior*—are not applicable to determine secondary liability in a securities violation case.

## AIDER AND ABETTOR

Appellant next claims MS&R is liable as an "aider and abettor" and conspirator. Secondary liability for securities violations can be imposed under these concepts as borrowed from the common law. Courts have defined aiding and abetting by referring to the *Restatement of Torts,* Section 876(b) (1939) and the criminal concept of aiding and abetting. The *Restatement of Torts*, Section 876(b) imposes liability for harm to a third party if the person "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, . . . ."

■ To impose liability as an aider-abettor under this section, it is necessary to find three distinct elements: (1) The existence of an independent wrongful act; (2) knowledge by the aider and abettor of that wrongful act; and (3) substantial assistance in effecting that wrongful act.[12] *Landy v. FDIC*, 486 F.2d 139, 162, 163 (3d Cir. 1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Therefore, the person who is primarily liable must have violated a securities law, and the alleged aider and abettor must have known of this violation and by his conduct substantially assisted the primary violater in carrying out the unlawful scheme.[13] The independent wrong requirement presents no problem. This is established by the fact that Rhoades was found guilty of violating Rule 10b–5, and his guilt has been affirmed by this court. Disposition of the second requirement, knowledge, presents a more difficult task. It has been held that liability for aiding and abetting may be found on less than actual knowledge of the illegal activity. *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 410 F.2d 135 (7th Cir. 1969). How much or how little knowledge would seem to vary with the facts of each case.[14] Courts that have considered the knowledge requirement have differed somewhat on its scope. In *Brennan v. Midwestern United Life Ins. Co.,* 417 F.2d 147 (7th Cir. 1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1122, 25

---

10. As one commentator observed:

"If other theories of liability such as agency, aiding and abetting, conspiracy, or direct participation are used, then the 'special' defenses of the controlling persons sections will apparently be unavailable." Ruder, "Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution," 120 U.Penn.L.Rev. 597, 608 (April 1972).

11. See *Landy v. FDIC,* 486 F.2d 139 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). This was also the case in *SEC v. First Securities Co. of Chicago,* 463 F.2d 981 (7th Cir. 1972), *cert. denied, sub nom. McKy v. Hochfelder,* 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972).

12. The proposed Federal Securities Code, § 1419 (b)(1) is modeled after § 876(b) of the Restatement of Torts. The Code would impose liability for securities law violations if one "gives substantial assistance to conduct by another person . . . with knowledge" that the conduct was proscribed. The American Law Institute, Federal Securities Code, Tentative Draft No. 3, Part XVII, General, § 1704(b)(3)(4)(b), [Aiders and Abettors].

13. 2 Bromberg, Securities Law: Fraud §§ 8.5 (582), 208.45 (1971); See also *SEC v. Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974).

14. This has led one writer to comment that the knowledge requirement may depend on whether the defendant's act was a misrepresentation or a nondisclosure. 2 Bromberg at §§ 8.5 (582), 208.43 (1970).

L.Ed.2d 397 (1970), the corporate defendant was found liable as an aider-abettor because it had knowledge of the fraudulent activity. The corporation knew of the misrepresentations, knew that funds were being used improperly, and failed to disclose this information even after inquiries were made. The court in *Brennan*, however, did not discuss at what point the secondary defendant's knowledge was enough to find liability. In *Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D.Pa.1946), the court said a secondary defendant is liable if he simply knew of the fraudulent act. Defendant National was stipulated out of the case because plaintiffs were unable to allege any more than National's failure to disclose. *Kardon v. National Gypsum Co.*, 73 F.Supp. 798, 803 (E.D.Pa.1947). After reviewing the record, we believe Rochez has not shown any evidence that MS&R had knowledge of Rhoades' fraudulent activities.

■■■ As an appellate court reviewing the facts as found by the district court, our responsibility is to review the record to determine if those findings were clearly erroneous.[15] After reviewing the evidence, if we are left "with the definite and firm conviction that a mistake has been committed," the findings of fact may be set aside. *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 quoting from *United States v. U. S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; *Speyer, Inc. v. Humble Oil,* 403 F.2d 766, 770 (3d Cir. 1968). We thus must accept the ultimate fact findings of the trial court unless its determination "(1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data. Unless the reviewing court establishes the existence of either of these factors, it may not alter the facts found by the trial court." *Krasnov v. Dinan,* 465 F.2d

1298, 1302 (3d Cir. 1972). Applying these principles to our review of the record, we are of the opinion that the findings of the district court were not clearly erroneous.

Appellant relies on several factors to show that MS&R had knowledge of the fraudulent activity and therefore should be held liable as an aider-abettor: The employment of Royce, said to be a "corporate purpose"; the Simmonds negotiation, alleged to be a sale of corporate assets; and the sale contract for the Rochez stock, said to be personal to MS&R since it was a party to the contract. Appellant also argues that MS&R is an aider-abettor because of alleged misrepresentations by Rhoades regarding MS&R's profit forecast and an order by Rhoades that MS&R mail was to be seen by him first.

As to the employment of Royce, the letter by Rhoades to Royce indicates the personal nature of this relationship. The letter was composed on Rhoades' own stationery showing his home address. The letter was signed only by Rhoades as an individual and not in his capacity as an officer of MS&R. Other testimony reveals the personal nature of the Rhoades-Royce relationship. As the district court found, Royce testified he never had any correspondence with anyone in MS&R except Rhoades (NT 1859). Johnson, MS&R's Treasurer, testified he was never introduced to Royce (NT 758, NT 1600) and knew of no connection between MS&R and Royce (NT 760, NT 1600). Hager, Vice President of Operations, met Royce but had no business-related contact with Royce (NT 759, NT 815). When Royce had not been paid his fee, he sought recovery from Rhoades and not MS&R (NT 604, NT 605, NT 1702). The district court found that the relationship between Rhoades and Royce was personal and MS&R was not involved. We agree with the district court.

**15.** Rule 52(a) of the Federal Rules of Civil Procedure governs appellate review of the trial court's findings of fact. Rule 52(a) in pertinent part states: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

The district court found the Simmonds negotiations and the facts surrounding it to be irrelevant. We agree and hold that the findings of fact are not clearly erroneous.

 The district court also found that the contract of sale between Rhoades and Rochez did not involve MS&R; that MS&R was a nominal party to the contract; and that no consideration whatsoever passed to MS&R. A reading of the contract indicates nothing that would imply MS&R had a substantive role. The stock was sold to Rhoades, not MS&R, and Rhoades, not MS&R, paid the purchase price. The fact that MS&R may have performed as a transfer agent is not significant as this was purely a ministerial act. See *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 152, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

 Finally the misrepresentations appellant refers to concerning profit forecasts had no bearing on the liability of Rhoades, *Rochez v. Rhoades*, 353 F.Supp. at 802, and cannot be used by Rochez to attempt to impose secondary liability on MS&R. The profit forecasts prepared by MS&R were not relied on by Rochez, nor by the district court in determining Rhoades' liability. *Rochez, supra* at 802–03. As to Rhoades' order that MS&R mail was to be seen by him first, the district court found it to be a legitimate function of MS&R employees to open MS&R mail. Instructions emanating from Rhoades' office, as chief executive officer, created no inference of any wrongdoing on the part of the corporation. Appellant attempts to use *SEC v. First Securities, supra*, for support of this argument. The reliance is ill-sought, because the president of First Securities violated a specific duty imposed on broker-dealers under Rule 27 of the National Association of Securities Dealers, Inc., *First Securities* at 988. No such duty existed in the present case.

In further support of its argument that MS&R is secondarily liable, Rochez cites to us *Affiliated Ute Citizens v. United States, supra* 406 U.S. at 128, 92

S.Ct. 1456. Although this case was not stressed in their brief, appellants placed great emphasis on it at oral argument Appellant claims that *Affiliated Ute* and the present case are indistinguishable. We disagree and find Rochez's reliance on this case to be misplaced.

In *Affiliated Ute*, two bank employees were found guilty of violating Rule 10b–5. The bank was also found liable coextensively with the employees. In determining liability, the court premised its holding on the fact that the bank had knowledge of the employees' activities. Therefore, if Rochez is to rely on this case, he must show that MS&R had the requisite knowledge of Rhoades' fraud. In *Affiliated Ute*, the bank knew the two employees were purchasing stock for their own accounts and were using the bank's facilities, premises and personnel in conducting their transactions. Also indicative of the bank's knowledge was a letter it sent to the plaintiffs that stated "it would be our duty to see that these transfers were properly made" and "the bank would be acting for the individual stockholders." 406 U.S. 128, 152, 92 S.Ct. 1456, 1471. In the present case, there is no evidence that shows Rhoades used MS&R's "facilities, premises or personnel" to further the fraud. Nor has any evidence been offered to show that MS&R engaged in any activities on its own that created apparent authority in Rhoades. Appellant has provided no evidence that would establish knowledge. Since we have found the district court's findings are not clearly erroneous, we conclude that *Affiliated Ute* cannot help Rochez overcome the defect in his argument.

After reviewing the foregoing findings of fact of the district court, we conclude that appellant failed to show that MS&R had knowledge of the fraudulent act.

 The final requirement of substantial assistance has not been shown by Rochez. If liability is to be imposed on a secondary defendant, the plaintiff must show a knowing participation or conscious involvement in the fraudulent

scheme.[16] In cases that have held an aider-abettor liable, the courts have consistently found an "involvement" in the actual scheme. In *SEC v. First Securities, supra,* the corporation held the president out as a successful investment counsellor and also permitted the president to enforce a rule prohibiting anyone from opening his mail, thus allowing the fraudulent scheme to continue undiscovered. Courts have been unwilling to extend vicarious liability where the secondary defendant's activity is mere inaction. Inaction may be a form of assistance, but only where the plaintiff is able to show that the silence of the aider-abettor was *consciously* intended to aid the securities law violation. *SEC v. Coffey,* 493 F.2d 1304, 1317 (6th Cir. 1974); *Hochfelder v. Midwest Stock Exchange,* 503 F.2d 364, 374 (7th Cir. 1974); *Lanza v. Drexel, supra* at 1300. In *Brennan v. Midwestern United Life, supra* at 150, 151, 154, 155, which is relied on by appellant, the corporation was found to be an aider-abettor because of its inaction and silence. However, liability was based on facts that showed the corporation had *actual knowledge* of the fraudulent activities and by its silence furthered the fraud. Since Rochez has been unable to satisfy all three requirements of the *Restatement of Torts,* we find that MS&R is not liable as an aider-abettor.

■ We also find no conspiracy existed between Rhoades and MS&R. It is essential that the plaintiff show an agreement to accomplish a wrongful purpose. There has been no evidence produced that would infer an agreement of any sort.

### SECTION 20(a)

Appellant Rochez next argues that MS&R is a "controlling person" and therefore is secondarily liable under Section 20(a) of the Securities Exchange Act of 1934. Rochez raised this theory of liability when it first appealed. Because the trial court had not made the necessary findings of fact to support the dismissal of MS&R, this court remanded to the district court to make those findings. On remand, the trial court found no liability on the part of MS&R because there was no evidence to show lack of good faith by MS&R, nor "any proof that MS&R . . . 'induced' Rhoades to commit 'the act or acts constituting the violation' of Rule 10b-5." [17]

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, provides that:

"Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

The purpose of this provision is to impose secondary liability on one who controls a violator of the securities laws, and who fails to show he acted in "good faith."

Our prior discussion of the legislative history of Section 20(a) is relevant here. As we determined in our evaluation of the 1934 Act, Congress intended that the

16. As one commentator stated:
"Some link, then, between defendants is essential unless vicarious liability is to lie for purely coincidental actions. It does not matter greatly what we call the link: agreement, understanding, combination, concert, mutual authorization, joint action or something else. The need is substantially the same whether we classify the defendants as participants, aider-abettors or conspirators. Certainly no formal agreement is necessary to forge the link, and a tacit understanding will suffice.

"The link, if not directly proved, may be inferred from parallel or complementary acts, prior relationships, common benefits, interchange of communications or other relevant factors." 2 Bromberg, *supra* § 8.5 (581).
See also *Zabriskie v. Lewis,* 507 F.2d 546, 554 (10th Cir. 1974); *Northway, Inc. v. TSC Industries, Inc.,* 512 F.2d 324, 340 (7th Cir. 1975).

17. Opinion of the district court, *Rochez v. Rhoades* at 390 F.Supp. 470 (W.D.Pa.1974).

element of culpability be proven to impose liability on a securities law violator. We have been able to find nothing that would dictate any other result.

Judge Adams concluded from his analysis of the legislative history in *Kohn* that culpable participation must be shown before liability for misrepresentation might attach. Because of this statutory scheme, we doubt that Congress would have imposed a provision like Section 20(a) and permitted liability to be found on something other than culpable participation. As we stated earlier, Congress, by enacting Section 20(a), did not intend anyone to be an insurer against the fraudulent activities of another.

The Second Circuit sitting *en banc* in *Lanza v. Drexel, supra*, discussed the legislative intent underlying Section 20(a) and found that

> "The intent of Congress in adding this section, . . . was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Lanza* at 1299.

In a more recent case, the Second Circuit reaffirmed this conclusion. In *Gordon v. Burr*,[18] the plaintiff attempted to impose secondary liability under Section 20(a) on a brokerage firm for material misrepresentations made by one of the firm's salesmen. The trial court found that the brokerage firm was a "controlling person" and therefore liable under Section 20(a). The Second Circuit reversed because it found nothing in the record to support a finding that the firm knew of the fraudulent misrepresentations "or in any meaningful sense culpably participated in them." *Gordon* at 1086. We hold, therefore, that secondary liability cannot be found under Section 20(a) un-

less it can be shown that the defendant was a culpable participant in the fraud.

■ Liability may be established whether the secondary defendant was directly or indirectly involved in the fraud, *Myzel v. Fields, supra* at 738, and may be premised on inaction, but only if it is apparent that the inaction intentionally furthered the fraud or prevented its discovery. In reference to our previous discussion of inaction concerning aider-abettors, it is sufficient to say there is nothing here that would show culpable participation because of MS&R's inaction. Inaction alone cannot be a basis for liability. We found that MS&R had no knowledge of Rhoades' fraudulent acts and did not "consciously intend" to aid Rhoades in his fraudulent scheme. The appellant would have been required to show that the defendant's inaction was deliberate and done intentionally to further the fraud.

■ Our next inquiry is to the meaning of "control" under Section 20(a). There is no statutory definition of "control"; however, the SEC has defined "control" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. Section 240.12(b)–2(f). Congress deliberately did not define "control,"[19] thus indicating its desire to have the courts construe the applicable provisions of the statute along with the evidence adduced at trial.

■ Many factors are involved in determining if one is a "controlling person." In making this determination, the courts have given heavy consideration to the power or potential power to influence and control the activities of a per-

18. 366 F.Supp. 156 (S.D.N.Y.1973); *rev'd in part*, 506 F.2d 1080 (2d Cir. 1974).

19. "[W]hen reference is made to 'control,' the term is intended to include actual control as well as what has been called legally en-

forceable control. . . . It was thought undesirable to attempt to define the term. It would be difficult if not impossible to enumerate or to anticipate the many ways in which actual control may be exerted." H.R. Rep.No.1383, 73d Cong., 2d Sess. 26 (1934).

son, as opposed to the actual exercise thereof.

By this analysis, the following were found to be "controlling persons": A company that established a special division within itself and gave broad authority to employees of the division, *Kamen v. Aschkar, supra* at 697; a company that selected a person to develop the corporation in another state and permitted him to deal with any matters concerning the corporation, and required him to make regular reports to the corporation's executive committee, *Richardson v. MacArthur*, 451 F.2d 35, 42 (10th Cir. 1971); a director of a company who, with his family, heavily invested in that company, *Mader v. Armel*, 461 F.2d 1123, 1125, 1126 (6th Cir. 1972); the partner of an investment banking firm who sat as a director of a company that the investment firm had substantial investments in, *Lanza v. Drexel, supra* at 1298.

It is our belief that *Rhoades* was the "controlling person," not MS&R. Rhoades was Chairman of the Board, chief executive officer and President of MS&R and owned fifty per cent of the issued and outstanding stock. Rhoades ran the day-to-day business activities of MS&R and obviously had the power to influence the policies and actions of MS&R. Rochez's argument that MS&R is a "controlling person" must therefore fail because Rhoades and MS&R cannot simultaneously be "controlling persons" as to each other.

Even if we were to determine that MS&R was the "controlling person," we accept the district court's findings that MS&R acted in good faith and did not directly or indirectly induce the acts constituting the fraudulent violations. Rhoades acted for himself at all times; the acts of MS&R employees were ministerial; MS&R was only a nominal party to the stock purchase agreement; Rhoades' fraudulent act did not benefit MS&R. Neither has Rochez shown any culpable participation on MS&R's part. Having expressed the necessity of showing culpable participation, we need not further burden the opinion with more discussion.

Since we are following the teachings of *Kamen, Lanza* and *Gordon*, secondary liability cannot be imposed on MS&R, even if we were to find MS&R to be a controlling person.

For the foregoing reasons, the judgment of the district court will be affirmed.