George R. MONSEN, Joseph J. Obermeyer, James Delgado, Joseph Cosgrove, Robert Cosgrove, and Justin Rosenstock and Eva Rosenstock as Trustees for Benjamin Rosenstock, Justin Rosenstock and Eva Rosenstock as Trustees for Renee Rosenstock, Justin Rosenstock as parent and natural guardian of Benjamin Rosenstock, Justin Rosenstock as parent and natural guardian of Eli Rosenstock, Justin Rosenstock as parent and natural guardian of Renee Rosenstock, Claudia Rosenstock and Eleanor Schwartz, Appellants in No. 77–1935,

v.

CONSOLIDATED DRESSED BEEF COMPANY, INC., Samuel Silverberg, Sidney Silverberg, Edward Silverberg, Michael Silverberg, Reuben Silverberg, Nathan Silverberg, Alan Silverberg and First Pennsylvania Banking and Trust Company.

Appeal of Samuel SILVERBERG et al., in No. 77–1936.

Appeal of FIRST PENNSYLVANIA BANK, N. A., in No. 77–1937.

Nos. 77–1935, 77–1936 and 77–1937.

United States Court of Appeals, Third Circuit.

Argued March 28, 1978.

Decided June 14, 1978.

M. Melvin Shralow, Shralow & Newman, Philadelphia, Pa., for George R. Monsen, et al., appellants in 77–1935 and as cross-appellees in 77–1936, 77–1937.

Miles H. Shore, Norman R. Bradley, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for First Pennsylvania Bank, appellee in 77–1935, 77–1936 and as cross-appellant in 77–1937.

Lester H. Novack, Cohen & Novack, Philadelphia, Pa., for Samuel, Sidney, Edward, Michael, Reuben and Nathan Silverberg, appellees in 77–1935 and 77–1937 and as cross-appellants in 77–1936.

Before ADAMS, VAN DUSEN, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

In these appeals we are called upon primarily to determine the propriety of imposing sanctions on a lending institution as an aider-abettor because of that institution's actions in connection with a loan to a borrower who violates the federal securities laws. We confront the perplexing dilemma of ascertaining when the legitimate business relationship between a lender and its borrower leaves the realm of propriety and enters the domain of proscribed conduct.

This conundrum arises from a class action brought on behalf of the holders of unregistered securities—promissory notes—issued by the Consolidated Dressed Beef Company, Inc. ("Consolidated"), a company whose stock was owned by the Silverberg brothers and Michael and Alan Silverberg, the sons of one of the brothers, (collectively "Silverbergs"), which borrowed money from the First Pennsylvania Bank, N.A. ("Bank"). Plaintiffs, former employees of Consolidated and their families, who had made loans

on the promissory notes from the company, alleged direct violations of sections 12(1) and 12(2) of the Securities Act of 1933 [1] and section 10(b) of the Act of 1934 [2] by Consolidated,[3] also violations of both acts by the Silverbergs as controlling persons,[4] and violations of both acts by the Bank as an aider-abettor to Consolidated and the Silverbergs.[5] Plaintiffs also sought recovery from the Bank on the basis of a pendent state claim predicated upon a common law constructive trust theory alleging that Consolidated is insolvent and that the Bank has taken control of all of Consolidated's assets and applied the proceeds to its debt.[6] After completion of the plaintiff's case, the trial judge dismissed the pendent state claim and the jury found for plaintiffs against all of the defendants on the remaining securities claims and awarded damages. On post-trial motions, the district court denied the Silverbergs' requests for judgment notwithstanding the verdict ("n. o. v."), denied both plaintiffs' and the Bank's request for judgment on the dismissed state claim, and granted the Bank's request for judgment n. o. v. on all counts. We affirm in part and reverse in part.

## I.

■ In these appeals from a grant and denial of judgment n. o. v., we must view the evidence in the light most favorable to the party that secured the verdict, drawing all reasonable inferences that the jury might have drawn to support its decision. *Thomas v. E. J. Korvette, Inc.*, 476 F.2d 471, 474 (3d Cir. 1973). An analysis of the record reveals the following facts, drawn from the pre-trial factual stipulations of the parties and a close reading of the testimony adduced at trial.

Consolidated is a now defunct Pennsylvania corporation which was until January of 1972, in the business of slaughtering, dressing, selling, and delivering meat and meat products. Its officers and directors are members of the Silverberg family. Prior to 1965, certain of the Silverbergs owned and operated a meat packing business under the name of Philadelphia Dressed Beef Company, a partnership, and in 1965 that partnership purchased all of the stock of Consolidated, continuing business under that name.

The initial payroll borrowing program was commenced by Philadelphia Dressed Beef Company by 1955—possibly as early as the 1930's—and then continued by Consolidated when it was acquired. Payroll deductions were made from the company's employees' salaries and promissory notes were issued in exchange. This arrangement was voluntary on the part of the employees who

---

1. 15 U.S.C. §§ 77*l*(1) & (2) (1976). Violations of section 77*l*(1), prohibiting the offer or sale of an unregistered security, and section 77*l*(2), prohibiting the offer or sale of any security containing untrue or materially misleading omissions of fact by means of interstate commerce, subject the seller or offeror to liability to the purchaser of the security.

2. 15 U.S.C. § 78j(b) (1976). This section prohibits the use of any "manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security and subjects the fraudulent seller or purchaser to personal liability.

3. In count I of the complaint, plaintiffs allege that the notes issued to them as members of the class by Consolidated constituted a sale of securities, required to be registered under the Securities Act of 1933, 15 U.S.C. § 77b(1) (1976), but that they were issued unregistered and with untrue statements of material fact, in violation of §§ 77*l*(1) & (2) of 15 U.S.C. In count II of the complaint, plaintiffs allege that

Consolidated had induced them to purchase securities by means of fraudulent omissions and erroneous statements of fact in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976) and rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1977).

4. The Silverbergs were alleged to be derivatively liable for Consolidated's securities violations in counts I and II of the complaint, by virtue of their control over a primary violator of the securities law. *See* 15 U.S.C. §§ 77o (1976) ("Every person who . . . controls any person liable under sections 77k or 77*l* of this title shall be liable . . . to the same extent as the controlled person") (1933 Act); 15 U.S.C. § 78t (1976) (liability for control of any violator of the 1934 Act).

5. Count IV of the complaint.

6. Count III of the complaint.

could elect to accept full salary instead of the notes. Any employee choosing to participate, however, was asked to sign a company prepared authorization form. Records were kept by the company of the amount of payroll deductions authorized by each participating employee.

At the end of three months of these deductions, the company issued a note in the name of the employee lender for the face value of the total of the payroll deductions made for the preceding quarter. These notes called for the repayment of the principal after five years and provided for the payment of interest to the employee every three months until maturity.

At first, the notes bore interest at a rate of seven percent per year, but subsequently the interest rate was raised to eight percent per annum. Employees participating in the program had the option of receiving interest quarterly or having the company accumulate it as consideration for additional notes. In 1970, after pressure from the noteholders, Consolidated accelerated the maturity date on the notes from five years to either one or two years. Employees enjoyed the option of accepting one-year notes, bearing an interest rate of one percent less than the two-year notes, or of accepting two-year notes.

At the same time, Consolidated had also instituted a parallel note program for non-employees and for those employees who lent the company supplementary funds outside of payroll deductions. Interest on these notes was paid either monthly or yearly and could also, at the election of the noteholder, be accumulated in return for additional notes.

Testimony at trial revealed that none of the noteholders were given financial information about Consolidated prior to their loans to the company. It is undisputed that the loans were generated out of employee loyalty to Consolidated and confidence in the Silverbergs' ability to manage the company. The notes were never registered under either state or federal law.

Consolidated kept detailed records on the progress of both the employee and non-employee note programs, first by hand and later by computer. Printouts eventually contained information showing the total deductions from each employee's paychecks, listed as a "savings" program, as well as showing data from the non-employee plans. This information, payment for the notes, and the notes themselves, all travelled in interstate commerce or through the mails.

By August of 1968, the company had continuously conducted its note program without ever missing a payment to its lenders, although it had accumulated a debt of several hundred thousand dollars through the program. At this time, however, the meat industry was beginning to change substantially. To successfully compete under these changed circumstances, Consolidated required additional funds. It therefore communicated with the Bank to arrange for supplementary financing. The Bank requested and received various financial data from Consolidated, including financial reports from 1966, 1967, and 1968 which contained information about the company's extensive liabilities incurred through the note programs. These reports were reviewed and analyzed by officers and employees of the Bank.

In September of 1968, John C. Wilson, manager of the Bank's branch office with which Consolidated did business, was requested by the Bank to pursue the Consolidated loan request. He spoke with Samuel Silverberg by telephone about conditions at Consolidated's plant, reviewed the company's financial statements, and attended meetings at and toured Consolidated's plant.

Further meetings also were in held in Wilson's office. At these meetings, financial statements containing entries describing the note program were discussed. Wilson asked for an explanation of these entries, and in response, Consolidated furnished the Bank with detailed statements listing each of the employee and non-employee lenders. Consolidated also furnished the Bank sample copies of the notes, forms, and sufficient additional information to inform the Bank that the noteholders were

primarily Consolidated's employees, their families, and friends of the Silverbergs, all of whom had loaned funds to Consolidated in reliance on the Silverbergs' ability to conduct a successful business. On September 18, 1968, following the delivery of this detailed information by Consolidated, the Bank entered into a financing arrangement with the company.

Under the terms of the lending agreement, the Bank became a secured creditor and the noteholders' obligations were effectively subordinated. The Bank was also given the power to restrict Consolidated from borrowing from any source other than the Bank. The record, however, reveals that the Bank not only did not bar additional financing elsewhere, but actually encouraged the continuation of financing through the note program. The Bank had informed Consolidated of its desire to have Consolidated raise funds through unsecured promissory notes, because it provided needed cash to the company and created assets from which the Bank could satisfy its debt. Consolidated, with the Bank's knowledge, never informed the noteholders that their increased investment in the company was subordinated to the Bank's security interest. Yet, knowing of this lack of disclosure and that the noteholders did not have adequate financial information about Consolidated, and that they had invested solely on faith in the Silverbergs, the Bank permitted—even encouraged—additional utilization of the note program.

Following consummation of the lending agreement between the Bank and Consolidated, the Bank regularly received monthly profit and loss figures, quarterly and semiannual financial statements, and yearly reports from Consolidated. The Bank was keenly aware of the deteriorating condition of the company due to marketing and supply changes in the industry,[7] but it nonetheless refused to curb Consolidated's use of the note program.

By January of 1972, Consolidated's position was so precarious that the Bank was forced to seize control of the company's assets. Consolidated was prevented by arrangement with the Bank from paying any interest on its notes or honoring them as they matured. The Bank proceeded to liquidate Consolidated's assets and to apply the proceeds to the company's outstanding debt to the Bank. Although the Bank's loan was only partially satisfied, none of the noteholders received any payment whatsoever after 1972 and their debt remains unsatisfied.

At trial the following legal conclusions were also stipulated: (1) the notes on which the plaintiffs brought suit were securities under the Securities Acts of 1933 and 1934; (2) the notes were not registered under federal or state laws; (3) interstate commerce was used in transporting the notes; and (4) Consolidated was liable for the face amount of each of the notes. Prior to trial, the district court ruled as a matter of law that Consolidated had violated section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(1) (1976) by its failure to register the notes.

With this factual background, the case was submitted to the jury on written interrogatories. The jury found Consolidated liable under section 12(2) of the 1933 Act, 15 U.S.C. § 77*l*(2) (1976) and section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) (1976), because of its misleading statements and omissions in connection with the note program. The jury also found the Silverbergs liable as controlling persons on the securities counts and the Bank liable as an aider-

7. Although 1968 had been a profitable year for Consolidated, in 1969, it began to suffer dramatic losses. In 1969, a strike occurred during the company's principal profit season, and had the effect of seriously eroding profits. Similarly, changes in the meat industry also began to affect the company's financial condition.

In 1970 the Chicago stockyards closed, making it difficult for Consolidated to purchase live cattle, the mainstay of its business. As a result, the company was forced to discontinue slaughtering and to buy dressed carcasses, which both decreased profit margins and left Consolidated with a large overhead for the unused portion of its plant.

In the nine-month period ending July 31, 1971, Consolidated lost $824,000. The Bank knew of these losses by virtue of financial statements from Consolidated.

abettor to Consolidated for its securities violations. The jury exonerated the Bank of any direct liability under section 10(b) of the 1934 Act. The jury returned a verdict against Consolidated for $421,639.30 and against the Bank and the Silverbergs for $152,561.44.

The Bank requested judgment n. o. v. on all counts including the dismissed pendent state claim; it stated that it was entitled to judgment as a matter of law due to the insufficiency of proof of any securities violation. The Silverbergs also moved for judgment n. o. v. on all counts of liability against them. The plaintiffs requested that the dismissed state claim be reinstated and that judgment be entered in their favor.

The district court granted the Bank's motion for judgment n. o. v. on the securities counts, stating that the evidence was insufficient to prove aiding and abetting. All of the other motions were denied. Plaintiffs appeal the grant of judgment n. o. v. in favor of the Bank; the Silverbergs appeal the denial of their motion for judgment n. o. v.; both the Bank and the plaintiffs appeal the dismissal of the pendent state count and the refusal of the court to grant a judgment on the merits of that cause of action. We consider each of these claims seriatim.

## II.

■ Plaintiffs appeal from the grant of judgment n. o. v. in favor of the Bank on all of the counts of the complaint alleging aiding and abetting of securities violations by the Bank. To sustain a charge of aiding and abetting, the plaintiffs have the burden of establishing: (1) that there has been a commission of a wrongful act—an underlying securities violation; (2) that the alleged aider-abettor had knowledge of that act;

and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing. *Gould v. American-Hawaiian Steamship Co.,* 535 F.2d 761, 779 (3d Cir. 1976); *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 886 (3d Cir. 1975) ("*Rochez II*") (stating the third element alternatively as "substantial assistance in effecting" the wrongful act); *Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139, 162–63 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).[8]

■ Knowledge of the underlying violation is a critical element in proof of aiding-abetting liability, for without this requirement financial institutions, brokerage houses, and other such organizations would be virtual insurers of their customers against security law violations. Culpability of some sort is necessary to justify punishment of a secondary actor and mere unknowing participation in another's violation is an improper predicate to liability. *See* Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, In Pari Delicto, Indemnification, and Contribution,* 120 U.Pa.L.Rev. 597, 638 (1972).

■ In *Landy v. Federal Deposit Insurance Corp., supra,* we indicated that the aider-abettor's knowledge of a securities violation must be actual. However, in *Gould v. American-Hawaiian Steamship Co., supra,* we stated that the "requirement of knowledge may be less strict where the alleged aider and abettor derives benefits from the wrongdoing." 535 F.2d at 780. Nevertheless, even in such a situation, "the proof offered must establish conscious involvement in impropriety or constructive notice of intended impropriety." *Id.*[9] Such involvement may be demonstrated by proof that the alleged aider-abettor "had general awareness that his role was part of an overall activity that is improper." *SEC v.*

8. *See Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 95 (5th Cir. 1975); *SEC v. Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974).

9. It has been suggested by the Fifth Circuit that when an alleged aider-abettor conducts what appears to be no more than a transaction in the ordinary course of business, the degree of knowledge must be higher than in the typical case. *Woodward v. Metro Bank of Dallas, supra,* 522 F.2d at 95. In the former situation, the court suggests that no liability may be found unless there is "clear proof of intent to violate the securities law." *Id.* at 97.

*Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974), *accord, Gould v. American-Hawaiian Steamship Co., supra,* 535 F.2d at 780. In determining this awareness, "the surrounding circumstances and expectations of the parties are critical." *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 95 (5th Cir. 1975).[10]

■ Equally important as knowledge in establishing an aider-abettor's liability, is proof of his substantial assistance or participation in the primary securities violation. The securities laws comprehend that mere knowledge of a violation alone, without assistance or a duty to disclose the violation, is not an actionable wrong. *See* Ruder, *supra,* 120 U.Pa.L.Rev. at 644. Nor have courts extended vicarious liability where the secondary defendant's conduct is nothing more than inaction. Such inaction, however, may provide a predicate for liability where the plaintiff demonstrates that the aider-abettor *consciously* intended to assist in the perpetration of a wrongful act. *Gould v. American-Hawaiian Steamship Co., supra,* 535 F.2d at 780; *Rochez II, supra,* 527 F.2d at 889.

It sometimes may be difficult for a court to reach a decision as to whether an alleged aider-abettor's conduct is sufficient to constitute substantial assistance or participation in a wrongful act. We therefore have pointed to the Restatement of Torts § 876 (1937) (liability for contributory tortfeasors)[11] for guidance to district courts for making that determination. The Restatement instructs the trier of fact to consider the following factors in determining wheth-

er a defendant's conduct constitutes substantial assistance: (1) the amount of assistance given by the defendant, (2) his presence or absence at the time of the tort, (3) his relation to the other person, and (4) his state of mind. *Landy v. Federal Deposit Insurance Corp., supra,* 486 F.2d at 162.

In applying the above standards to the proof adduced by plaintiffs at trial, the district court concluded that the evidence was insufficient to support the jury's finding of aiding and abetting by the Bank and that the verdict should be reversed. The court concluded, first, that the Bank rendered no assistance to the securities violation, second, that the Bank never participated in the sales and was absent at the time they occurred, third, that the Bank made no representations to the buyers of the notes and owed them no legal duty of disclosure, and fourth, that although the Bank gave limited encouragement to Consolidated to continue the note program, the evidence failed to show any intention by the Bank to further a securities violation.[12]

Plaintiffs claim that the district court's review of the evidence was unduly narrow, that the court incorrectly applied the standards governing aiding-abetting liability, and that therefore the verdict must be reinstated. Plaintiffs assert that this overly restrictive approach to the evidence caused the court to erroneously avoid the cardinal principal of review of a jury's verdict—that judgment n. o. v. should not be awarded as long as "there is conflicting evidence or there is insufficient evidence to make a 'one-way' verdict proper." *Thomas v. E. J.*

---

10. Analysis of aiding and abetting knowledge unavoidably "harks back to the nature of the security that is the object of the transaction." *Woodward v. Metro Bank of Dallas, supra,* 522 F.2d at 95. In the case of publicly issued stock the alleged aider-abettor may be more easily charged with knowledge of the circumstances surrounding the sale of a security than in the privately sold security. *Id.*

11. Section 876 of the Restatement provides in pertinent part:

 § 876 Persons Acting in Concert

 For harm resulting to a third person from the tortious conduct of another, a person is liable if he

\* \* \* \* \* \*

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself,

\* \* \* \* \* \*

12. The district court also indicated its concern that the evidence failed to prove scienter by the Bank in its aid of Consolidated's securities violations as required by *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), in a private cause of action for damages. We consider the sufficiency of the Bank's scienter at n. 17, *infra.*

*Korvette, Inc., supra,* 476 F.2d at 474. We agree.

▮ There is no question that the record clearly establishes the first element of proof of aiding-abetting. Consolidated committed underlying securities violations of sections 12(1) & (2) of the 1933 Act and of section 10(b) of the 1934 Act. (*See* pp. 798–799, *supra*.) As to the second and third elements, the district court, in its opinion disposing of the post-trial motions, stated that the evidence showed: (1) that the note program was instituted on behalf of friends and employees of the Silverbergs, (2) that the Bank had knowledge of the promissory note program and should have known of its illegality, (3) that the Bank as a secured lender encouraged the note program to continue, thus improving the Bank's position at the expense of the noteholders, and (4) that the Bank had the authority to require Consolidated to discontinue the note program. Taking the evidence in the light most favorable to the prevailing party, the record sufficiently supports the jury's findings that the Bank had knowledge of the underlying securities violations and substantially assisted or participated in their accomplishment.

### Evidence of Knowledge of the Primary Violation

Olinto R. Serafini, who worked for Philadelphia Dressed Beef Company and for Consolidated from 1942 to 1972 as its bookkeeper, office manager, and comptroller, testified that the Bank was advised that funding from the note program had continuously increased over the years prior to the Bank's loan, that Consolidated had begun to lose substantial amounts of money, that no financial information was given to the noteholders, and that the noteholders never received information of the declining profit margins of Consolidated.

Wilson, manager of the Bank's branch dealing with Consolidated's loan, substantiated this testimony. He stated: the Bank had extensive knowledge of the note program; the Bank understood that the funds derived from this program were lent to Consolidated principally on confidence in the Silverbergs and faith in the company; the transactions were not at arm's length; the securities were not registered;[13] the Bank, with assistance from its own securities analyst, had discussed the possibility of Consolidated making a public issue of stock; and the Bank considered the noteholders as investors. Ralph Henry, Wilson's superior at the Bank, confirmed that the Bank knew that the funds produced by the note program were obtained on faith, without financial information.

Samuel Silverberg, the President of Consolidated, testified that the Bank was told that the noteholders had lent money to Consolidated solely on the basis of trust and that such lenders were provided with no financial information about the company.[14] In critical testimony, he revealed that the Bank had demanded subordination of the note program and guarantees of its continuation, with full understanding that the com-

13. The district court held that the Bank should have known that the securities were required to be registered from its inspection of the notes, the financial statements supplied by Consolidated, and the Bank's familiarity with the securities laws.

14. Samuel Silverberg's testimony concerning the Bank's knowledge that the noteholders were given no financial advice about Consolidated prior to their advances was as follows:
 Q: In other words, these [the noteholders] were people who had faith and trust in you, your family, and your family's company, isn't that right?
 A: That's correct.
 * * * * * *

 Q: And, this was made known to the bank when they inquired about this plan, wasn't it, that this is the kind of person who was listed [in the statements sent to the Bank]?
 A: That's correct.
 Q: It was also made known that the basis of the investment was trust and confidence, and not financial, technical information, isn't that correct?
 A: That's correct. There was no technical, financial information given, to the best of my knowledge.
 Q: And, this was made known in your discussions concerning [the supporting material for the loan]?
 A: That's correct.

pany could not disclose the junior status of the notes to the noteholders and expect them to continue to lend funds to the company.[15]

### Evidence of "Substantial Assistance"

Bank officers Wilson and Henry testified that the Bank desired that the note program be subordinated to its position and that the Bank encouraged Consolidated to ensure the program's continuation. In fact, it may be fairly stated that the Bank attempted to extract a promise from Consolidated that the program would continue.[16] They also testified that the Bank had the power to prevent further borrowing by Consolidated from the noteholders, but that the Bank never exercised it.

### Sufficiency of Evidence of Aiding-Abetting

We believe that this evidence, taken in the light most favorable to the verdict winner, is adequate to support the jury's finding of the Bank's liability as an aider-abettor. At a minimum, the evidence reveals: the Bank was well informed about the note program; it knew that the notes were unregistered; it either knew, or as a major metropolitan banking institution should have known, of the registration requirement for the notes; it knew that the noteholders were receiving no financial information, but were trading on faith in the Silverbergs; it knew that Consolidated would not reveal either its financial difficulties or the junior status of the promissory notes to the noteholders; and with this knowledge the Bank demanded subordination of the notes and actively encouraged Consolidated to continue the note program. It is true that knowledge alone of the note program would have been an insufficient predicate for aiding and abetting liability against the Bank. Similarly, had the Bank merely required the continuation and subordination of the note program without knowledge of the Silverbergs' intent not to disclose the subordination to the noteholders, liability might not have been established. This combination of knowledge and action by Bank, however, is sufficient evidence to support the jury's verdict on the Bank's liability.

The district court held the proof insufficient to make out a violation of the securities laws because it contained no evidence of an intent by the Bank to assist a

---

**15.** Silverberg testified that he notified the Bank of Consolidated's intention not to fully disclose to the noteholders their junior position and the terms of the Bank's loan to the company. He stated:

> They [the Bank] wanted to know what the notes were. I told them strictly promissory notes. . . . A request was made that the notes become subordinated to any bank debt. *I told them that could not be done without alienating all the noteholders and having them disappear off the scene.* And, after that kind of discussion, it was finally agreed we'd just leave the notes stay as notes.

(Emphasis supplied.)

**16.** Mr. Wilson's testimony concerning the Bank's insistence upon the continuation of the note program is as follows:

> Q: Isn't it . . . true that it was your concern that the cash and capital of [Consolidated] not be depleted by a large outflow of money represented by those notes?
> A: Yes.
> Q: And, isn't it true that you told Mr. Silverberg that it was the bank's desire that

the practice or the past history of the notes steadily increasing continued to be the case with this company?
> A: Yes.

> * * * * * *

> Q: And, in fact, you encouraged Mr. Silverberg to continue to receive funds on this basis, because it was a very economic way for the company to receive funds on an unsecured basis, isn't that correct?
> A: Yes.

Mr. Henry, Wilson's superior at the Bank confirmed Wilson's testimony:

> Q: Did you and Mr. Wilson discuss whether the company should be encouraged to continue or expand the issuance of such notes in return for cash?
> A: Yes.
> Q: What was that discussion?
> A: We encouraged the company to do this.

> * * * * * *

> Q: Were you aware of whether the bank, through Mr. Wilson or yourself or anyone else, asked for the company's assurance that it would continue to [do] so?
> A: I assume we did.

primary violation of securities law.[17] In determining the Bank's intent, however, the district court did not consider the critical fact that the Bank *knew* that the company would not reveal the Bank's superior position to the noteholders, and in the face of that position nonetheless insisted upon the continuation of the note program. With Consolidated in a deteriorating financial condition, the Bank's requirement of assurances of the continuation of an unregistered security program knowing of Consolidated's intention not to disclose the weaknesses of the program, is tantamount to proof that the Bank's conduct was a major substantive factor in aiding the fraud against the noteholders.[18] Therefore, the Bank cannot be heard to complain that it did not substantially assist in Consolidated's violations. It may be that had we been the triers of fact in this case we might not have held the Bank liable on this record, but the evidence does provide adequate support for the *jury's*

verdict and under our limited role on appeal we cannot usurp their function.

### III.

The Silverbergs assert that the district court erred in denying their motion for judgment n. o. v. on the securities violations. They request that we separate the evidence of liability as to each of the Silverbergs individually. We have viewed the evidence separately, but we nonetheless find sufficient evidence to support the verdict against each of them.

It was stipulated at trial that all seven of the Silverbergs were officers, directors, and shareholders of Consolidated and that they were in fact the only officers, directors, and shareholders of the company. Furthermore, Serafini, Consolidated's comptroller, testified that all of the Silverbergs constituted the board of directors of the company and that each was present at the meetings of the company in which the note program

17. The court also held that the Bank rendered no assistance to any securities violation, that it did not participate and was not present at the sale of the securities, and that it made no representations to the buyers and was under no duty to do so. We believe that these conclusions are erroneous, as the evidence shows the Bank's active role in the continuation of the note program. It monitored the program monthly and made it clear as an initial matter that the program would have to continue if Consolidated were to obtain a bank loan. Although the Bank itself was not present at the sale of the securities, it had full information on each sale and it required Consolidated to inform it of the specifics of the expanding note program. Finally, it is true that the Bank had no direct duty to the purchasers of the notes, but it was not merely an innocent third party. Rather, it enhanced its position at the expense of the noteholders with knowledge of Consolidated's deception of the noteholders.

The district court also stated its belief that the record insufficiently established the Bank's scienter in Consolidated's violation of section 10(b) of the 1934 Act. Scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 194 n. 12, 96 S.Ct. at 1381. Without reaching the issue of whether the Bank's reckless disregard of Consolidated's deception may constitute scienter, we hold that the Bank's knowledge of the company's intention not to disclose the subordinated position of the noteholders and the Bank's intention to

take advantage of the noteholders' junior status is sufficient proof of manipulative intent to fulfill the scienter requirement and thereby support the Bank's aiding and abetting liability.

18. This case is thus distinguishable from *Woodward v. Bank of Dallas, supra.* In *Woodward,* plaintiff, an accommodation maker of a borrower of the bank, sued the bank as an aider-abetter of the borrower's securities violation—a duty and failure to disclose to the plaintiff the borrower's hopeless financial condition. The bank had pressured the borrower to find a guarantor for an additional loan, but there was no evidence that the bank had a continuing understanding of its borrower's intention to withhold information from others from which it sought funds. The court concluded on such facts that no liability would be justified. As is evident, in *Woodward* the plaintiff did not establish the bank's knowledge of its borrower's fraud. That lack of knowledge is the critical difference between that case and the instant one. The same distinction eliminates the problem of aider-abettor liability for a bank envisioned by Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution,* 120 U.Pa.L.Rev. 597, 630–31 (1972) (fear of extension of liability to bank as aider-abettor when bank has no knowledge of underlying violation), cited by the *Woodward* court. *Woodward v. Metro Bank of Dallas, supra,* 522 F.2d at 96.

was discussed. He specifically recollected his presence at meetings in which the programs were described and discussed in full detail among all of the Silverbergs. He stated that so far as he knew, there were no parts of the program unknown to any of them.

 Such knowledge placed each of the Silverbergs on notice as to Consolidated's violations of the securities acts and therefore subjected them to liability, as controlling persons, for the company's violations "to the same extent" as the company. 15 U.S.C. §§ 77o, 78t (1976). Under *Rochez II, supra,* 527 F.2d at 890, a director may not be found liable unless he has culpably participated in the controlled person's unlawful activity. The knowledge of each of the Silverbergs of the dynamics of the note program and their presence at board meetings at which the program was considered is sufficient proof of their culpability to support the jury's verdict. We affirm the district court's denial of the Silverbergs' motions for judgment n. o. v.

 Both the plaintiffs and the Bank contend that the pendent state claim was erroneously dismissed by the trial court. Each suggests that judgment be entered in its favor as a matter of law. Our review of the district court's dismissal of this claim is confined to determining whether the court abused its discretion. Under that standard we find no reversible error.

The district court dismissed plaintiff's pendent state claim asking for declaration of a constructive trust in its favor of Consolidated's assets seized by the Bank because the court perceived a possibility of jury confusion between that issue and the federal securities claims. In *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court indicated that "there may be reasons . . . such as the likelihood of jury confusion . . . that would justify" dismissal of pendent state claims. *Id.* at 726–27, 86 S.Ct. at 1139; *see Robinson v. Penn Central Co.,* 484 F.2d 553, 556 (3d Cir. 1973) (court has discretion to dismiss pendent state claim because of judicial economy and

fairness to litigants even after trial has begun). Following that principle, we find no abuse of discretion by the trial court in its dismissal of the plaintiffs' state claim and express no view on the merits of their cause of action.

## IV.

To recapitulate, we conclude:

(1) The district court's judgment n. o. v. in favor of the Bank on the securities claim will be reversed and the jury's verdict reinstated.

(2) The denial of the Silverbergs' motions for judgment n. o. v. will be affirmed.

(3) The district court's dismissal of the plaintiffs' pendent state claim and its refusal to grant judgment on that claim to the plaintiffs or the Bank will be affirmed.