Arnold I. LAVEN, on behalf of himself and all others similarly situated, Plaintiff,

v.

Robert M. FLANAGAN, Russell W. McFall, Richard E. Horner, T. Roland Berner, Charles E. Ehinger, Richard P. Sprigle, Curtiss–Wright Corporation, Western Union Corporation, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Defendants.

Gregory John SHEFFIELD, Plaintiff,

v.

Richard E. HORNER, et al., Defendants.

David JAROSLAWICZ, on behalf of himself and all others similarly situated, Plaintiff,

v.

WESTERN UNION CORPORATION, Russell W. McFall, Richard E. Horner, Robert M. Flanagan, Defendants.

Andrew H. SHARPE, on behalf of himself and all others similarly situated, Plaintiff,

v.

Robert M. FLANAGAN, Russell W. McFall, Richard E. Horner, T. Roland Berner, Charles E. Ehinger, Richard P. Sprigle, Curtiss–Wright Corporation, Western Union Corporation, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Defendants.

John A. PIMM, on behalf of himself and all others similarly situated, Plaintiff,

v.

Robert M. FLANAGAN, Russell W. McFall, Richard E. Horner, T. Roland Berner, Charles E. Ehinger, Richard P. Sprigle, Curtiss–Wright Corporation, Western Union Corporation, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Defendants.

Civ. A. Nos. 84–5092, 85–0075, 85–0238, 85–0623 and 85–0624.

United States District Court, D. New Jersey.

Sept. 30, 1988.

---

John C. Harkins, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant Western Union Corp.

Alexander Kerr, Hoyle, Morris & Kerr, Philadelphia, Pa., for defendants Flanagan, Horner and McFall.

Harold R. Tyler, Jr., Patterson, Belknap, Webb & Tyler, New York City, for defendant Curtiss–Wright Corp. and defendants Berner, Sprigle, and Ehinger.

E. Michael Bradley, Brown & Wood, New York City, for defendant Merrill Lynch, Pierce, Fenner & Smith, Inc.

Richard D. Greenfield, Greenfield & Chimicles, Haverford, Pa., Leonard Barrack, Barrack, Rodos & Bacine, Philadelphia, Pa., for plaintiffs.

GERRY, Chief Judge.

Defendants Curtiss–Wright Corporation and T. Roland Berner, Charles E. Ehinger, and Richard P. Sprigle have brought a motion for summary judgment against plaintiffs Arnold I. Laven, Andrew H. Sharpe, John A. Pimm, Clayton P. Spitz, Fred Kornick, and Friedrich E. Neumann, representatives of classes of persons who purchased some of the 5,000,000 depository preferred shares in Western Union Corp., pursuant to a registration statement and prospectus effective April 16, 1984, and two prospectus supplements effective April 17 and April 27, 1984. One class ("Class I") purchased these shares during the period extending from April 16, 1984 to November 27, 1984. This class has alleged violations of section 11 and section 15 of the Securities Act against defendants based upon the contention that Western Union's prospectus contained untruths and omissions on matters of material fact and that defendants were controlling persons of Western Union. A second class ("Class II") consisting of those who bought their shares from Merrill Lynch, who underwrote the offering, allege that defendants have violated section 12(2) of the Securities Act by aiding and abetting Merrill Lynch's violations of the same section. Finally, plaintiff David Jaroslawicz, on behalf of himself and that class of persons who purchased Western Union common stock from March 19, 1984 to July 13, 1984 alleges that defendants both aided and abetted, and are primarily liable for, violations of section 10(b) and section 20 of the Securities Exchange Act, as well as Rule 10b–5 promulgated under the Act. These allegations, like the others, are based upon Western Union's 1984 registration statement and prospectus. Defendants have moved for summary judgment on all claims against them. Their motion is granted.

These complaints were filed on August 25, 1986. Both sides have enjoyed extensive discovery and have filed numerous affidavits and exhibits in favor of and opposing this motion.

804

FACTS

At all times relevant to this action, defendant Berner was Chairman and President of Curtiss–Wright Corporation. Defendants Ehinger and Sprigle were Executive Vice Presidents of Curtiss–Wright. From July 1981 to August of 1982, Curtiss–Wright purchased 20.5% of the total Western Union voting shares. Curtiss–Wright's purchases were preceded by thorough inquiries that convinced the Curtiss–Wright board that Western Union was "the most undervalued telecommunications company in the market." (Berner Aff. ¶ 10) Time would tell just how wrong this estimate was.

Curtiss–Wright claims to have been interested in Western Union solely as an investment. Whatever their motive, the possibility of their obtaining a majority of Western Union shares was hampered when Western Union acquired the E.F. Johnson company in the fall of 1982 over the objection of Curtiss–Wright. This transaction diluted Curtiss–Wright's interest to 17.5% of the Western Union voting stock. Curtiss–Wright's interest would remain at this level for the remainder of the period relevant to this action. Even at 17.5%, Curtiss–Wright remained the largest shareholder in Western Union.

In the fall of 1983, Western Union negotiated a "standstill" agreement with Curtiss–Wright. The agreement permitted Curtiss–Wright to name three directors to the 16–person Western Union board. The Western Union board was still free to act without Curtiss–Wright approval. Curtiss–Wright was required to vote for Western Union's 13 nominations to the board. Curtiss–Wright was also precluded from acquiring more than 25% of Western Union stock.

On November 22, 1983, defendants Berner, Sprigle, and Ehinger of Curtiss–Wright took their place on the Western Union board pursuant to the standstill agreement. At a meeting on this date, the Western Union board was informed of the adoption of Generally Accepted Accounting Principles, which had become effective on November 1, 1983. Also discussed was the proposed strategy of shifting marketing emphasis from Western Union's established telex service to its new EasyLink service. The board also approved the budget for 1984.

In early December 1983, Western Union announced a multi-million dollar writedown of its plant and equipment. Berner, Sprigle, and Ehinger had little to do with the writedown, since it had been proposed before their election to the Western Union board, and none of them served on the Audit Committee when the particulars of the writedown were discussed. The board was assured by both management and the Price Waterhouse accounting firm that the writedown was proper and would insure an accurate statement of Western Union's assets. Nevertheless, it was a first indication that Western Union's assets were not undervalued, but overvalued. However, Berner, Sprigle and Ehinger continued to believe that the company's asset figures were understated. (Berner aff. ¶ 62, Ehinger aff. ¶ 37).

On February 28, 1984, the Western Union board approved increased expenditures for the marketing of its EasyLink service at management's recommendation. The board also learned that the company's new Airfone air-to-ground telephone service was ready to commence in the second quarter of the year.

On March 21, 1984, the board's finance committee considered an offer by Merrill Lynch, Pierce, Fenner & Smith to purchase and underwrite a public offering of $50 million in Western Union preferred shares. Berner objected to this sale on the grounds that the 14% dividend rate and redemption premium granted to Merrill Lynch were too high. Berner proposed that Western Union issue common stock, not preferred, and that Curtiss–Wright would purchase its proportionate share (17.5%). When the full board met on March 27, 1984, Berner reiterated his objection, asked to be recorded as voting in opposition, and proposed that Curtiss–Wright buy the entire issue of preferred shares without the redemption premium, so as to lower the cost to Western Union. On April 10, the Curtiss–Wright

proposal was rejected by the Finance Committee in favor of Merrill Lynch.

Accompanying the offering of preferred shares was a registration statement and a prospectus. The statement was signed by all Western Union directors, including Berner, Sprigle, and Ehinger. For purposes of this motion, the prospectus shall be considered to have constituted a deception of the potential investor, in that it presented a "generally rosy picture of Western Union as a company poised to take a leadership role in the telecommunications industry [while] the truth is that it was on the verge of collapse." (Plaintiff's brief, p. 1). The new marketing strategies for 1984 were "high risk" and could succeed only with "large amounts of external financing." The signatures of Berner, Sprigle, and Ehinger appeared on the prospectus with the other 13 directors of Western Union. Nevertheless, the affidavit testimony of Berner, Sprigle, and Ehinger shows that they believed the prospectus to be truthful.

Merrill Lynch proceeded to underwrite the offering of preferred shares and sell them to the public. In June of 1984, two months after the offering, Berner purchased 1;000 shares of Western Union common stock for his own account. In the months before and after the offering, Western Union management continued to issue routine and reassuring press releases to the investment community, and as regular policy the board of directors was never asked to clear such releases.

On August 28, 1984, the Western Union board unanimously voted to discharge Chairman Robert M. Flanagan. Plaintiffs aver that Berner had sought Flanagan's removal, based upon Flanagan's deposition testimony that he had heard from another board member (Harper Sibley) that "Mr. Berner was trying to force me out of the company ..." (Flanagan deposition p. 246–47, Komins Aff., Exhibit P). However, Flanagan also stated that his belief in this was "[o]ne of a thousand beliefs I had." (Tyler Aff. Exhibit B p. 253) and two non-Curtiss-Wright members of the Western Union board present at the meeting stated that Berner, Sprigle, and Ehinger did not take the lead in ousting Flanagan. (Sibley Aff. ¶ 8, Kheel Aff. ¶ 10).

As a replacement for Flanagan, the board offered the chairmanship to several directors, all of whom rejected it. The board finally turned to Berner who took the position on an interim basis, which was to last approximately three months.

In November of 1984, during Berner's brief tenure as chairman, the company's banks cancelled a $100 million line of credit that had been approved in September. The resulting cash shortage caused Western Union to cancel payment of dividends. The price of the company's stock began a swift decline. After Berner was replaced as chairman by Robert Leventhal (not Berner's candidate; his was John Pope, who was rejected) in December of 1984, Berner, Sprigle, and Ehinger found themselves increasingly "frozen out" of the management process. Secret "informal" meetings of the board were held without them, and several Western Union officers were directed not to talk to them.

In early December 1985, Curtiss-Wright sold a small portion of its Western Union shares for tax reasons, thus reducing its proportionate share in Western Union to 16%. The Western Union board immediately demanded the resignation of two out of the three Curtiss-Wright directors, over their objections, because under the terms of the standstill agreement Curtiss-Wright was limited to representation on the board in proportion to its share in the outstanding voting stock. The next month, Curtiss-Wright wrote a sorrowful finis to its Western Union venture by selling all of its remaining shares and incurring a loss of $57.3 million. It only remains to be stated that Western Union's subsequent writedowns of its assets in 1986 were done without the advance knowledge of Berner, Sprigle, and Ehinger during their terms as directors of Western Union.

LEGAL ANALYSIS

Defendants have moved for summary judgment on the issue of their liability to plaintiff class of Western Union shareholders based on the allegedly fraudulent prospectus and accounting procedures of

Western Union, urging (1) that Curtiss–Wright and Berner, Sprigle, and Ehinger were not "controlling persons" under section 15 of the Securities Act of 1933 (15 U.S.C. § 77*o*) or section 20 of the Securities Exchange Act of 1934 (15 U.S.C. § 78t); (2) that Curtiss–Wright and Berner, Sprigle, and Ehinger did not culpably participate in any violation of section 15 of the 1933 Act; section 20 of the 1934 Act; or aid and abet a securities violation under section 11 of the 1933 Act (15 U.S.C. § 77k) or section 10(b) of the 1934 Act (15 U.S.C. § 78j(b)) and its concomitant rule 10b–5 (17 C.F.R. § 240–10b–5); (3) that Berner, Sprigle, and Ehinger did comply with their duty of due diligence during their term as directors of Western Union so as to avoid any primary liability under section 11 of the 1933 Act; (4) that Curtiss–Wright did not violate section 12(2) of the 1933 Act (15 U.S.C. § 77*l*(2)) as an aider and abettor of Merrill Lynch.

## I. STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted only when the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir.1986). The moving party has the initial burden of identifying evidence that, if uncontroverted, would entitle them to a directed verdict at trial. *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 362 (3d Cir. 1987); *Equimark Commercial Financial Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir.1987). The burden then shifts to the adverse party to point to the evidence showing a genuine issue for trial; i.e., the evidence that would allow a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *Matsushita Electric Industrial Co v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, the adverse party must show more than a "metaphysical doubt as to the material facts". *Matsushita* 475

U.S. at 586, 106 S.Ct. at 1356. In this case, disagreement between defendant and plaintiff turns more on questions of law than of fact. Plaintiff does not challenge defendants on most facts, and discrepancies can be reconciled with reference to the record.

## II. CONTROL LIABILITY

Section 15 of the Securities Act of 1933 (15 U.S.C. 77*o*) provides that:

Every person who, by or through stock ownership, agency or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency or otherwise, controls any person liable under section 11 [15 USCS § 77k] or 12 [15 USCS § 77*l*], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

Section 20 of the Securities Exchange Act (15 U.S.C. § 78t(a)) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

The standards to be used in determining whether a defendant is a "controlling person" under section 15 or section 20 are the same. *Pharo v. Smith*, 621 F.2d 656, 673 (5th Cir.1980). *Securities and Exchange Commission v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir.1975). The Securities and Exchange Commission has defined "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and poli-

cies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b.2 *cited in Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 890 (3d Cir.1975). The Third Circuit has stated that "[i]n making this determination, the courts have given heavy consideration to the power or potential power to control ... as opposed to the actual exercise thereof." *Rochez* at 890–91. The Third Circuit test for "control" is therefore broader than the test enunciated by the Eighth Circuit in *Metge v. Baehler,* 762 F.2d 621, 631 (8th Cir.1985) *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986) which defendants urge us to adopt. *Metge* would require (1) actual participation in the general operation of the corporation and (2) power to control the specific transaction that gave rise to the lawsuit. The issue of control will be examined with reference first to Curtiss–Wright and then to Berner, Sprigle, and Ehinger.

### A. *Curtiss–Wright*

Defendant Curtiss–Wright contends that (1) it lacked actual control over the running of Western Union; (2) its status as the largest shareholder in Western Union is not enough to constitute control; and (3) the actions of Berner, Sprigle, and Ehinger on the Western Union board cannot be imputed to Curtiss–Wright.

■ Defendants argue that neither Curtiss–Wright nor Berner, Sprigle, and Ehinger were ever able to exercise control over the affairs of Western Union. The facts support this. Curtiss–Wright was unable to prevent the dilution of its proportionate share in Western Union from 20.5% to 17.5%. The standstill agreement limited Curtiss–Wright to 25% stock ownership in Western Union, and three seats out of 16 on the Western Union board of directors. Curtiss–Wright could not contest Western Union's nominations for the other 13 seats. The record of Berner, Sprigle, and Ehinger on the Western Union board was one of impotence. No major proposals advanced by Curtiss–Wright or Berner, Sprigle, and Ehinger were adopted, and they were unsuccessful in opposing many Western Un-

ion initiatives, including the one giving rise to this litigation.

■ Similarly, defendant argues that Curtiss–Wright's status as the largest shareholder does not establish control, especially in light of the restrictions on potential stock ownership and proxy solicitation created by the standstill agreement. Therefore, Curtiss–Wright lacked even the potential power to control Western Union's decisionmaking. Plaintiff argues in response that Curtiss–Wright exercised control through the apprehension its large block of stock caused to Western Union's management. (Plaintiff's brief p. 57–58). Without minimizing such concerns, it seems fair to see them as a good deal less warranted after the standstill agreement had precluded Curtiss–Wright from engaging in a proxy fight or attaining a significantly larger proportion of shares. Hence, Curtiss–Wright cannot be described as a controlling person merely by virtue of its ownership of stock.

■ Finally, defendant Curtiss–Wright contends that the control exercised over Western Union by Berner, Sprigle, and Ehinger as directors cannot be imputed to Curtiss–Wright. Defendant correctly states that "knowledge or duty to know and ... failure to act as a director (of one company) cannot be made the constructive knowledge, duty to know or act of a second company" merely because a director concurrently serves as an officer of the second company. *Gould v. American–Hawaiian Steamship Co.,* 535 F.2d 761, 780 (3d Cir. 1976). Defendant also argues that Berner, Sprigle, and Ehinger had fiduciary duties to Western Union shareholders and had taken office as Western Union directors with an express understanding of this. Because they fulfilled these duties and even occasionally advocated positions that were against Curtiss–Wright's interests, they cannot be said to have been "controlled" by Curtiss–Wright (Berner Aff. ¶ 57).

However, when Merrill Lynch's offer was first considered by the Western Union finance committee on March 21, 1984, Berner's objection was coupled with a counterproposal that Western Union issue common

stock, and that Curtiss–Wright would buy its proportionate share. (Berner Aff. ¶¶ 49, 50). This indicates that Berner apparently felt that he had authorization to make such an offer. Berner later acted as spokesman for Curtiss–Wright when it made its alternative offer to purchase the proposed $50 million offering of preferred shares for its own account. Berner, Sprigle, and Ehinger properly withdrew from the meeting and abstained from voting. None of this proves that Berner, Sprigle, and Ehinger were acting as agents of or controlled by Curtiss–Wright when they sat on the board of directors of Western Union. Nevertheless, it does constitute evidence upon which a reasonable jury could find for the plaintiff that Berner, Sprigle, and Ehinger represented the interests of Curtiss–Wright on the Western Union board. *Gould*, 535 F.2d at 779. It remains, then, to be determined whether, if their actions be imputed to Curtiss–Wright, Berner, Sprigle, and Ehinger acted in such a manner as to constitute "controlling persons."

### B. *Berner, Sprigle, and Ehinger*

■ As has been established, Curtiss–Wright's "power or potential power to control" Western Union was dependent upon the actions of Berner, Sprigle, and Ehinger as directors of Western Union. Those actions, however, hardly constitute a litany of omnipotence. Plaintiff and defendant both characterize Berner, Sprigle, and Ehinger and Curtis–Wright as "outsiders whose presence was never welcome ... to Western Union management." (Defendant's brief p. 45) or "hounds" to be kept "at bay". (Plaintiff's brief p. 59) The Western Union marketing strategies for EasyLink and Airfone were well under way when Berner, Sprigle, and Ehinger arrived on the board. The record is replete with instances where Berner and his colleagues engaged in futile efforts to persuade the board. When they acted with the majority on the board, as in Flanagan's replacement as chairman, they did not lead. The board ultimately voted to oust two out of three of its Curtiss–Wright members. With their number limited to three by the standstill agreement, the hostility towards the Cur-

tiss–Wright designees on the Western Union board precluded any exercise of actual power or accumulation of potential power in the day-to-day running of the company. And while not dispositive, precedent in other circuits suggests that control liability is most appropriate when "defendant possessed the power to control the specific transactions or activity upon which the primary violation is predicated...." *Metge v. Baehler*, 762 F.2d at 631; *Lanza v. Drexel Co.*, 479 F.2d 1277, 1298 (2d Cir.1973) (*en banc*). Even conceding that Berner, Sprigle, and Ehinger had the power and knowledge to insist upon a more accurate prospectus before signing it, their futile opposition to the Merrill Lynch offering suggests that their power to control this transaction was limited, at best.

Finally, Berner's temporary elevation to the chairmanship from August to December 1984 suggests powerlessness rather than power. Berner took a job no one else was eager for, due to the growing realization that Western Union was in serious financial trouble. Berner was unable to control the choice of his successor, and the year after his resignation saw the increasing exclusion of Berner, Sprigle, and Ehinger from company information and access to management. In any normal situation, a director should be presumed to be a controlling person concerning the acts of the corporation. However, a mere showing of the status of director does not automatically connote liability as a controlling person. "... Congress [intended] to impose liability only on those directors who fall within its definition of control ..." *Rochez*, 527 F.2d at 890, *quoting Lanza*, 479 F.2d at 1299. *See also, Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir.1984).

### III. CULPABLE PARTICIPATION; AIDING AND ABETTING

■ Even if Curtiss–Wright and Berner, Sprigle, and Ehinger are found to have had control under section 15 of the Securities Act and section 20 of the Securities Exchange Act, plaintiff must still show culpable participation. Section 15 provides that no liability will lie if "the controlling

person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability ... is alleged to exist." 15 U.S.C. § 77(o). Section 20 similarly precludes liability where "the controlling person acted in good faith and did not directly or indirectly induce the act ... constituting the violation ..." 15 U.S.C. § 78t(a) *Rochez*, 527 F.2d at 889–90. These two elements are not alike: the first goes to knowledge, the second goes to culpable participation. *Rochez* 527 F.2d at 884–85. However, because both knowledge and culpable participation (knowing and substantial assistance)[1] are elements of an aiding and abetting claim under Rule 10b–5 or section 11 of the Securities Act, and the determinative facts on these issues is the same, they will be considered together.

█ In order to provide a case of aiding and abetting a security violation under Rule 10b–5 or section 11, a plaintiff must show:

(1) an independent wrongful act; and

(2) knowledge by the aider and abettor of that wrongful act; and

(3) knowing and substantial assistance in effecting that wrongful act.

*Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir.) *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978).

Citing Second Circuit precedent, plaintiff contends that aiding and abetting liability may be premised on recklessness as well as knowledge. *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478, 484–85 (2d Cir.1979) *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980). However, Third Circuit cases have established a requirement of knowing participation, particularly when, as here, liability is premised largely on the alleged inaction and neglect of the defendants. *Sharp*

*v. Coopers & Lybrand*, 649 F.2d 175, 185 (3d Cir.1981) *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *Gould*, 535 F.2d at 780, *Rochez*, 527 F.2d at 889. To premise liability upon inaction, plaintiff must demonstrate that "the aider-abettor *consciously* intended to assist in the perpetration of a wrongful act." *Monsen*, 579 F.2d at 800.

Turning then to the facts of this particular case, we may assume that the Merrill Lynch offering prospectus constituted an underlying violation. To prove knowledge, plaintiff points to the actions of Berner, Sprigle, and Ehinger in signing the presumedly fraudulent prospectus that accompanied the Merrill Lynch offering. The reason for this action was purportedly Curtiss–Wright's and Berner's knowledge of the precarious financial position of Western Union, and the need to prop up the company with an infusion of fresh capital. Plaintiff's case that Curtiss–Wright and Berner, Sprigle, and Ehinger positively knew that Western Union was an overvalued company rests largely upon Berner's statement found in the minutes of the meeting of the Western Union Executive Committee held on March 13, 1984. At that meeting, the proposed acquisition of Communications Cable, Inc., a cellular radio company, was discussed. The minutes of the meeting relate that "Mr. Berner expressed the view that the failure of the convertible preferred financing indicates that the corporation (Western Union) may be on the verge of a financial crisis." (Komins Aff., Exhibit F). Plaintiff argues in addition that Berner's knowledge of imminent disaster should be imputed to Curtiss–Wright: "... a corporation's knowledge and action can only be that of its directors ..." *Gould*, 535 F.2d at 780.

---

1. Plaintiff argues that culpable participation should be considered an affirmative defense, citing *Gould*, 535 F.2d at 779, where culpable participation was referred to as a "statutory defense" to be proved by the defendant. We think, however, that the weight of precedent and the Third Circuit's analysis of Congressional intent, favors the view that the plaintiff must show culpable participation as an element of secondary liability. *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 185 (3d Cir.1981) *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *Rochez*, 527 F.2d at 889, 890. Thus, the burden of proving culpable participation under section 20 rests with the plaintiff, as does the burden of showing knowing and substantial assistance under Rule 10b–5 and section 11.

In response, defendant points out that Berner's statement has been wrenched from context. We agree. Berner very properly expressed concerns about the means of implementing a takeover without the planned financing. Subsequently, the financing was arranged to the satisfaction of the entire Western Union board, on March 26, 1984 (Berner Reply Aff. Exhibit F. p. 40029266). Berner continued to buy Western Union shares as late as June 1984. Moreover, the affidavit testimony of Berner, Sprigle, and Ehinger shows quite convincingly that they believed the company to be undervalued rather than the opposite, and that they opposed the Merrill Lynch offering because the terms were too unfavorable for a company with the potential of Western Union. Curtiss–Wright's actions in offering to purchase the entire Merrill Lynch offering is fully consistent with this erroneously optimistic view. Plaintiff suggests that Berner, Sprigle, and Ehinger and Curtiss–Wright's acts in investing in Western Union and offering to invest more were the acts of an investor trying to buoy up a sinking company until it could sell out on more favorable terms. This supposition would not be wholly implausible were it backed with evidence, but, after extensive discovery, plaintiff has been unable to come up with anything other than Berner's finance committee statement. To avoid summary judgment, the "mere existence of a scintilla of evidence in support of plaintiff's position is insufficient; there must be evidence on which the jury could find for the plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2510. Also, such a policy would have been extremely risky, especially when Merrill Lynch's underwriting of the offering seems to have ensured that Curtiss–Wright capital was not indispensible to keeping Western Union healthy. "[I]f the factual context renders [plaintiff's] claim implausible—if the claim is one that makes no economic sense— [plaintiff] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

Even if Berner's statement is sufficient for a reasonable jury to find knowledge on his part, such knowledge cannot be imputed to Curtiss–Wright without violating the Third Circuit's strictures against *respondeat superior* liability in securities fraud cases especially where the underlying violation was caused by an officer's inaction. *Gould*, 535 F.2d at 779–80; *Rochez*, 527 F.2d at 886.

The final element of aiding and abetting liability is knowing and substantial assistance in effecting the underlying fraud. Plaintiff cites the act of Berner, Sprigle, and Ehinger's signing the prospectus, and argues that this, coupled with the gain to Curtiss–Wright that would accrue through the propping of Western Union, constituted substantial assistance. What with the afore-noted implausibility of the latter point, plaintiff is left to contend that the lone act of signing the registration statement and prospectus was substantial assistance. This seems too slender a reed upon which to ground the liability of Berner, Sprigle, and Ehinger. It appears highly unlikely that the absence of their signatures would have dissuaded investors, and the law only requires the signatures of a majority of directors. Section 6(a), Securities Act of 1933, 15 U.S.C. § 77f(a), *Armstrong v. McAlpin*, 699 F.2d 79, 92 (2d Cir.1983) ("In the absence of a claim that approval by [defendant] was a prerequisite to the purchase or sale of stock, his advice could not even be considered a 'but for' form of proximate cause ... Awareness and approval, standing alone, do not constitute substantial assistance.") Findings of substantial assistance generally require the aider and abettor to exercise greater influence and control over the underlying fraud than the reluctant assent manifested by Berner, Sprigle, and Ehinger. *Monsen*, 579 F.2d at 801 (substantial assistance found where bank encouraged fraud to continue, and had authority to discontinue it). Unlike the bank in *Monsen*, Berner, Sprigle, and Ehinger found themselves in lone opposition to the offering, and unable to prevent it.

Therefore, no aiding and abetting liability can be found against Berner, Sprigle, and Ehinger or Curtiss–Wright in absence

of their knowledge of or substantial assistance to the Merrill Lynch offering. For the same reasons, plaintiff has failed to show any culpable participation or knowledge by Berner, Sprigle, and Ehinger or Curtiss–Wright, as required by section 20 of the Securities Exchange Act and Section 15 of the Securities Act.

## IV. PRIMARY LIABILITY

### A. *Berner, Sprigle, and Ehinger and Section 11*

■ Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, provides for strict liability for those responsible for filing a fraudulent registration statement:

(a) In case any part of the registration statement, when such part became effective, contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at any time of such acquisition he knew of such untruth or omission), may either at law or in equity, in any court of competent jurisdiction, sue—

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in, the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

The statute does provide an affirmative defense, proof of which defendant bears the burden:

as regards any part of the registration statement not purporting to be made on the authority of an expert, and not purporting to be a copy of or extract from a report or valuation of an expert, and not purporting to be made on the authority of a public official document or statement, *he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were*

*true and that there was no omission to state a material fact ...*

15 U.S.C. § 77k(b)(3)

■ Thus, directors such as Berner, Sprigle, and Ehinger can escape from section 11 liability by proving their due diligence in pursuing a reasonable investigation. *Lanza v. Drexel Co.*, 479 F.2d at 1296. In pursuing such an investigation, a director may reasonably rely upon the representations of his subordinates. *Id.* However, it is not enough for a defendant to possess a good faith belief in the truth of a registration statement. That belief must be found reasonable by an objective standard. Defendant's affidavits and actions have shown that they actually, if mistakenly, believed Western Union to be a company in robust health in April of 1984. For purposes of avoiding liability they must prove that their belief was reasonable.

Defendants' argument centers on the careful review of the prospectus, and their reliance on the independent audits of the Price Waterhouse accounting firm, the independent investigations conducted by Merrill Lynch and Salomon Brothers, and the assurances of Western Union management. Plaintiff responds by pointing specifically to the contents of Western Union's 1984 budget as contained in a document prepared for use by its lending banks. This document, presented on April 5, 1984, contained facts not mentioned or downplayed in the prospectus that accompanied the Merrill Lynch offering that was issued that very month. Plaintiff points to the high risk strategy contemplated by Western Union management in order to offset the expected losses accompanying the gradual phasing out of the company's long time warhorse, Telex, and its replacement with EasyLink. (Plaintiff's brief 17–19). Apparently, management hoped to recoup these losses with swift growth in profits from its embryonic cellular phone lines and air-to-ground phones. The chances of such risks paying off were lessened, argues plaintiff, by the delays Western Union had been experiencing in launching production of these products. Therefore, Berner, Spri-

gle, and Ehinger's failure to reconcile the prospectus with these facts violated their duty of diligence. Plaintiff's second argument based on Berner's spoken fears that Western Union was on the verge of financial crisis, has been dealt with *supra*. Finally, plaintiff charges that the depreciation of the declining Telex business was improperly low. (Plaintiff's brief p. 26).

Defendant has responded specifically to these charges, but we need not wade into a discussion of the merits and demerits of Western Union product performance. Defendant has shown that Curtiss–Wright and Berner, Sprigle, and Ehinger acted carefully and diligently in choosing an investment. As directors, they relied upon the representations of Western Union management concerning production schedules for Western Union products such as EasyLink and Airfone (Berner Aff. ¶¶ 21–24, Ehinger Aff. ¶¶ 5–7; and Berner Aff. Exhibit 15) and independent investment and accounting firms. As outside directors they were under a lesser obligation to conduct a painstaking investigation than an inside director with an intimate knowledge of the corporation. *Goldstein v. Alodex Corp.*, 409 F.Supp. 1201, 1203 n. 1 (E.D.Pa. 1976). Their reliance on the representations of Western Union management cannot be characterized as unreasonable, particularly when it was confirmed by the investigations of Price Waterhouse and Merrill Lynch. Berner, Sprigle, and Ehinger actively worked to bring their knowledge of Western Union activities up to speed in the months between their accession to the Western Union board and the Merrill Lynch offering. Their work was imperfect, to the regret of plaintiff and certainly, in light of its $57.3 million dollar loss, to Curtiss–Wright. But their activities were a far cry from the passive and total reliance on company management that defeated the due diligence defense in *Escott v. BarChris Construction Corp.*, 283 F.Supp. 643, 688–89 (S.D.N.Y.1968). As such, we must deem it to have been a reasonable effort to seek verification of the truth of the registration statement.

B. *Berner, Sprigle, and Ehinger and 10b–5*

Plaintiff's also have assigned primary liability to Berner, Sprigle, and Ehinger under Rule 10b–5. As has been discussed in ¶¶ III, *supra*, plaintiff has failed to present any credible evidence of *scienter*, as is required to make out a viable 10b–5 claim. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed. 2d 668 (1976). Plaintiff argues that questions of *scienter* should not be decided on summary judgment because:

"Summary judgment is seldom appropriate in cases in which particular states of mind are decisive elements of claim or defense, because state of mind is so often proved by inferences from circumstantial evidence and by self-serving direct evidence."

*Magill v. Gulf & Western Industries, Inc.*, 736 F.2d 976, 979 (4th Cir.1984). However, more recent precedent suggests that summary judgment can be granted if plaintiff fails to present credible evidence of *scienter*. *Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 344 (2d Cir.1987); *Froid v. Berner*, 649 F.Supp. 1418, 1424–25 (D.N. J.1986). Plaintiff must do more than simply attack defendants' affidavits as "self-serving" and argue that a jury could choose to disbelieve them without offering any evidence that would provide a basis for such belief. "It is not sufficient for plaintiff to merely contend that defendant's affidavits may be untruthful—if that were the sole basis to defeat a motion for summary judgment, then none would ever be granted". *Froid*, 649 F.Supp. at 1420. *See also, Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

## V. AIDING AND ABETTING LIABILITY UNDER SECTION 12(2)

Finally, plaintiff's complain that Berner, Sprigle, and Ehinger and Curtiss–Wright have violated section 12(2) of the Securities

Act (15 U.S.C. § 77*l*). Section 12(2) provides that any person who:

"offers to sell a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or [omission] ... and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to person purchasing such security from him."

■ By its terms, section 12(2) provides a cause of action only against an offeror or seller, and plaintiff's remedy under this statute would seem to lie against Merrill Lynch, but not Curtiss–Wright. The Third Circuit held as much in *Collins v. Signetics Corp.*, 605 F.2d 110, 111 (3d Cir.1979) and refused recovery under section 12(2) to a plaintiff not in privity with the issuer. The court stated "this section is designed as a vehicle for a purchaser to claim against his immediate seller. Any broader interpretation would not only torture the plain meaning of the statutory language but would also frustrate the statutory scheme because Congress has also provided a specific remedy for a purchaser to utilize against the issuer as distinguished from the seller of a security." Recently, in *Pinter v. Dahl*, —— U.S. ——, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) the Supreme Court read the parallel provision of section 12(1) more broadly, including "in the statutory seller status at least some persons who urged the buyer to purchase. For example, a securities vendor's agent who solicited the purchase would (be liable) ... even though the agent himself did not pass title." *Id.* 108 S.Ct. at 2077. But, the court cautioned, "[a]t the very least ... the language of section 12(1) contemplates a buyer-seller relationship not unlike traditional contractual privity." *Id.* at 2076. Thus, the court included brokers and others who solicit a sale, as well as the actual seller, in the category of a "seller" under section 12, but went no further. Indeed, the court rejected the broader "substantial factor" test: "Being merely a 'substantial factor' in causing the sale of ... securities is not sufficient in itself to render a defendant liable ..." *Id.* at 2082. Neither the Supreme Court nor the Third Circuit has dealt expressly with the question of whether aiding and abetting liability is appropriate under section 12. Still the language of *Pinter* and *Collins*, the text of the statute itself, and the existence of other provisions provided by Congress for redress against issuers such as section 10(b) of the 1934 Act or section 11 of the 1933 Act, persuade us that a claim for aiding and abetting a violator of section 12(2) should not be allowed. Other courts have reached the same conclusion. *Harrison v. Enventure Capital Group, Inc.*, 666 F.Supp. 473, 476 (W.D.N.Y.1987); *Frymire v. Peat, Marwick Mitchell & Co.*, 657 F.Supp. 889, 892 (N.D.Ill, 1987); *Hokama v. E.F. Hutton & Co.*, 566 F.Supp. 636, 640–42 (C.D.Cal. 1983); *Benoay v. Decker*, 517 F.Supp. 490, 494 (E.D.Mich.1981) *aff'd.* 735 F.2d 1363 (6th Cir.1984); *Hagert v. Glickman, Lurie, Eiger & Co.*, 520 F.Supp. 1028, 1033–34 (D.Min.1981).

■ Even if we are in error, and some form of aiding and abetting liability is permissible under section 12(2), we do not think it can be applied to this case, for plaintiff must still show some knowing and substantial assistance to prevail on such a claim. Here Curtiss–Wright and Berner, Sprigle, and Ehinger opposed Merrill Lynch's bid, and took no part in the sale of the offering. Therefore, plaintiff has no case based on an aiding and abetting theory under section 12(2).

The accompanying order has been entered.